argument on the calendar. Johnson v. Brown, case number 22-35624. Good morning again, Your Honors. Stephen Jonkis for 72 plaintiffs, which includes 70 individuals and two non-profits. And this, who are challenging the constitutionality of Governor Brown's vaccine order for school employees, medical workers, and state employees. The plaintiffs have a liberty interest in refusing unwanted medical care. The question in this case is what is the standard of review? Different standards of review have been applied to this case. What the Supreme Court has done when it looks at what the standard of review is, is it looks back at the context of the claim and decides how important that is. For example, in Cruzan, they looked back in history, which had to do with a brain-dead individual whose parents wanted to remove life support and the Missouri wanted to protect life and keep this brain-dead person on life support. The court looked back at history and looked at the context of that right. So in the context of an experimental vaccine, history tells us that the rights relative to an experimental vaccine are defined in the Nuremberg Code. Can we back up to talk about jurisdiction? And again, we have a mootness issue here because the order has been rescinded. Does that order moot all the equitable and declaratory relief claims in this? So you're just down to damages? Except for the, yes, to the extent that the government won't reissue their order in the later date. So we don't have like the, in the prior case, we had the reinstatement issue still live on equitable, but here equitable is gone as moot, subject to a mootness exception like voluntary cessation, etc. Right. The governor could still reissue an order compelling employees to be vaccinated. So I don't believe it's moot for that reason, but the main issue is damages. I mean, again, it's, it's similar to the earlier argument. Brock is a significant obstacle to invoking the mootness exceptions. The main reason we're here, Your Honor, is on, on the damages. We have a damages claim. Okay. But now damages, you have official capacity. Those are clearly barred by the 11th Amendment. So then we just have the personal capacity and then, however, everything has to be viewed through the lens of qualified immunity. So, I mean, we could do the merits of the case, but we could also just, as you know, we have the discretion to do either step of qualified immunity. So we could just, for this case, look at the substantive issues through the lens of was it clearly established that it violated substantive due process? And that seems to be a very heavy lift. No, Your Honor, because they knew that they could not compel experimental vaccines. Matter of fact, the state waited until there was an approval of a vaccine, Comernity, before they issued the requirement that you get vaccinated. But it, but it was a, it was a, an empty approval. Comernity never existed. In the normal 1983 case we get over the years, it involves allegations of misconduct by law enforcement. And in that context, the cases are quite clear that clearly established means there's a decision of a court of competent jurisdiction saying it is clearly established that, fill in the blank. Do you have that here? No, we don't. But we have a Juice Coggins right that was applied ex post facto during World, after World War II. It was an inherent right. So you don't get one free pass. You don't get one free pass with a Juice Coggins right. You're saying that that gets you out of qualified immunity? Juice Coggins international right gets you out of qualified immunity? Because Juice Coggins is the standard, the standard, a human rights standard for a due process. Where's the, okay, let's go down this rabbit hole and say that that's true. Where's the clearly established right that establishes this under Juice Coggins international law? That seems even less likely. I mean, for qualified immunity, I'm talking about qualified immunity here, which I think was Judge Hawkins question. Where's your clearly established right? It was so clearly, it's a human right to have informed consent without duress or coercion. So that's the human right. And that human right was so inherent in humans that it was applied ex post facto when the Nuremberg codes were written down. You don't, and again, going back to the qualified immunity case law, if you don't have a case that squarely governs in the sense that Judge Hawkins was describing, then the residual standard is that you have a situation where every reasonable person would know that you can't do this under the law. But we can look at the state of the law today and there's lots of courts that have held that, that have rejected challenges similar to what you're making. So it seems very hard to say that this meets the every reasonable person would know you can't do this standard of qualified immunity. Well, none of them address the experimental nature of the vaccine in those cases and did not apply what that means in terms of the plaintiff's rights. So setting qualified immunity aside, if we were to get into the substantive issue, tell me why you're not foreclosed under your due process claim by Jacobson. Jacobson is the 1905 case where the Supreme Court said, no, you, you, the, the, uh, the government can require vaccines. Jacobson didn't deal with experimental vaccines. Jacobson, it was a polio vaccine that was a hundred years old. It's like, it's a different issue when you deal with an experimental drug versus a drug that's been approved as safe and effective. This drug was, has been a poison. It has killed 13 million people in the world. The, you cannot apply Jacobson, um, because it was a refund case. The plaintiff Jacobson wanted to get his money back, his $5 back. He paid as a fine. It was a refund case. And the court said, no, you don't get the, you don't get that back. My clients would have loved to have paid, you know, the today's value of $5, you know, a couple hundred bucks to avoid having to take the vaccine. Here, we're talking about a huge increase, a huge difference in the consequences for, for taking this drug. It was irreversible, killed a lot of people, maimed a lot of people. What are the specific adverse actions that you're alleging with respect to these particular plaintiffs? Um, they, they are, they, across the board, some were fired. Um, some, um, sought religious exceptions, got them and were fired. Some, um, were demoted. Some got the vaccine and were injured. Um, it's, it's, it's a, there's a varied of different outcomes. Now, is your claim that it's an experimental treatment? At some point, the FDA, I mean, initially there was an emergency use authorization, but at some point the FDA did give, um, regular approval. No, they didn't. They gave regular approval to a drug that doesn't exist. It is, it is an epitome of a fraud by the government. The, the, the BioNTech is the Pfizer drug that was an emergency use authorized. They came along in August of 2001 and said, uh, 2021, and said, we're going to approve Comirnaty, a different drug that's similar, but legally distinct, legally distinct. But they never intended to ever actually produce that drug or allow it to be available. Because, you know, what the, um, CDC or what the FDA says is that in December of 2020, they issued the first emergency use authorization for use of the Pfizer BioNTech COVID-19 vaccine. And then in August of 2021, um, that the FDA approved the first COVID-19 vaccine, Comirnaty, which was previously known as Pfizer BioNTech COVID-19 vaccine. So it draws an equivalence between the two products. It tries to, it tries to, but they can't do that because what was on the shelf was BioNTech. And they also said they were legally distinct in that footnote. Now, legally distinct means one is approved and the other is unapproved, whole different world on whether, um, you can mandate it or not, um, whether one is approved or unapproved. And Comirnaty was never in existence. It was never sold in the United States. Pfizer never intended to sell it in the United States. So what they did was they fooled the vaccine out there and the people flocked. And that was their intent to fool the government, to fool the public. They flocked to get the vaccine and what they got were EUA vaccines. That's all they could get. That's all it's been ever been available. And then the government of Oregon continued with the fraud. They changed, they had on their website, uh, 2 million doses of BioNTech administered. The next day they said 2 million doses of Comirnaty. Now the name and the label on the bottle is of all importance in pharmaceuticals. You cannot magically say now it's approved. Everything out there is, is, um, authorized. So it was a bait and switch is what it was. Um, do you want to reserve? Yes, I do. Okay. Thank you. Good morning, your honors. May it please the court. Dustin Buehler representing the So, um, I think I'll actually adopt, um, and use judge Collins framework. Um, and I'll address first the mootness question that's lurking here briefly, answer any questions on that. Um, and then, uh, transition into a discussion of the merits. I do agree with you, judge Collins, that the merits probably at this point should be viewed, um, given the concession of counsel, that this is really about damages at this point through the lens of qualified immunity. Um, because those are, of course, as the bench already noted, as the court already noted, the damages at play here would be damages in their personal capacity, in which, in which case we'd look at the qualified immunity, uh, question and whether there's clearly established law here. On the mootness question, is Kate Brown still the governor of Oregon? No. Uh, and Patrick Allen, the other named defendant aptly here is no longer the, uh, director of the Oregon Health Authority. He actually is the director of the New Mexico mootness. We just substitute the current officials. And if the case were not moved, correct, that for whatever reason has not been done here, uh, as of date. Um, uh, so that's right. And, and, uh, as of now, it's been nearly a year and a half, um, since the state of emergency in Oregon was rescinded, was terminated, um, by the prior governor. And it has been nearly a year and a half since the, uh, state employee vaccine mandate was rescinded. Um, and then as, um, the court knows it has been a three, four months since the other directives that issue in this case were permanently, permanently repealed as well. The reason I asked about the change in the chief executive of the state of Oregon has the new governor indicated any intent or willingness to reinstate this mandate? No, she has not. Governor Kotick has not. Uh, the Oregon Health Authority has not stated any intention whatsoever in reinstating any of these mandates that issue in this case. I will add what I think is obvious to all of us, which is, look, it was hard to do that at the time. It, I cannot frankly imagine the set of circumstances in which these mandates would be reimposed in this form. Um, and that is why I do think, especially given what this court said in Brock, this case is likely moot, at least as it pertains to the request for injunctive and declaratory relief here. Um, and, uh, if you then look at the damages question, um, knowing, of course, that the 11th amendment prohibits damages in these officials' official capacity. Can I ask you a question there? Because when you said that, you can't imagine that they would be reimposed in this form. Is that a load bearing weasel phrase or what is that? Yeah, let me restate it, Judge. Uh, I frankly can't imagine they would be reinstated by the state in any form. Um, I, I think we can all recognize, Judge, you mentioned earlier, we all lived through this. I don't need to... The former probably doesn't reach... Sure. ...doesn't satisfy Brock, but the latter... Point well taken. Point well taken. I will stick with the latter then, which is what I intended. Um, I just cannot imagine given the policy and politics of where we are now. Um, and, and frankly, there have been substantial changes in the trajectory of the pandemic too. We are no longer in a place like we were two years ago when these directives were adopted, where case counts in Oregon went in seven short weeks from 138 a week, I mean, sorry, 138 a day to 2200 a day with only 45 hospital beds left and adult ICU beds. So it's just different now. And, um, to answer the court's question, there, there has been no statement of intent to go back to these mandates. And I cannot imagine the set of circumstances where the state would impose any type of mandate like this. I just can't. Um, looking at damages, um, the damages claims, uh, requests for damages. So the court has already, I think, identified the key problem there with, um, the claims in plaintiff's complaint, which is even if this novel theory is interesting, um, there is no, I mean, counsel concedes the or anything else gives a heightened level of, uh, heightened standard of review here for the substantive due process claims. Um, and then if we are, uh, in a world where that's the case, then, um, the only remaining, uh, uh, relief that plaintiffs seek here just cannot be given by the court at this point, um, because of qualified immunity. And I will note, uh, a qualified immunity argument and a sovereign immunity argument were advanced below in, uh, the defendant's the district court did not reach those arguments, but of course this court can affirm on alternative grounds if it's so chooses. Um, uh, just talking briefly about rational basis review, transitioning to the merits and of course, viewing under the lens of qualified immunity as judge Collins suggested earlier, uh, here, if we are in a world of rational basis review, the important question I imagine this court would have, which it is asked in prior arguments today is, well, what do you make of the fact that this was a dismissal on a 12 B six posture? And, uh, what do we make of the allegations in the complaint? And you've heard some of that in argument today, um, where plaintiffs, um, sincerely fear these vaccines or think that they have created, um, worldwide, uh, some, uh, adverse consequences for individuals. Um, they say millions of individuals around the world have to take those. We have to take those at face value or do we have to pressure test that against common sense? Yeah. So we, um, Ash Ashcroft, the Iqbal says that when testing the plausibility of those allegations, you have to view those in the lens of common sense and judicial experience. And as the district court did below, did so below, I think that does mean that you take well pleaded facts as true and that in judging what would be a reasonable inference from the facts, we use common sense. Iqbal does not authorize us to say that a fact pleaded in a complaint is false under my common sense based on stuff I, you know, pull off the internet. I can't do that. Well, um, respectfully, Your Honor, I do think, uh, Iqbal Twombly and Iqbal read together. Um, I think there are allegations which can be fantastic, just completely fantastic. One that I know of that fits that is the videotape chase case whose name is escaping me, where the video trumps allegations in the complaint because the video is what it is. And you just can't deny what it what's before your lion eyes, so to speak. Right. Well, and and and what's coming to my mind, Judge, is we can't take like the CDC claims X. And so therefore, now I will believe the CDC and disbelieve the complaint. Iqbal does not authorize us to do that. Well, but let's remember we are proceeding here under a substantive due process claim where all you need is a rational basis. So in other words, but we may not need to get there. I mean, I guess the question is, what do we do? And I haven't gone back to look at the complaint references the CDC. It does. Then you could bring that in. But I think to Judge Collins point, that doesn't mean that you bring it in and say, I mean, I don't think you get into the wane at the complaints. I don't know. But maybe your better argument is it doesn't really matter. Well, it doesn't if we're viewing it through the lens of qualified immunity. That's that's really I mean, you can have these allegations. But if you're legal theory, I mean, going back to that, taking a step back, if you're if at the end of the day, you're viewing it in the lens of qualified immunity, which the defendant appellees believe he should, given where we are in this, they just don't have a cognizable legal theory, even if they plead for facts like that, because there was not clearly established law. Essentially, they would have to show that that every reasonable person would view Jacobson as distinguishable. And lots of reasonable people have viewed Jacobson as being controlling. Right. Well, and permit me, I recently listened to an excellent podcast that says Jacobson's a bit of a Rorschach test. We read into it, whatever we want. But at the same time, my reading of it is, look, that was a pretty severe mandate. There were no religious exemptions. There were no medical or disability exemptions. Still allowed. I'm sorry, Your Honor. Jacobson was allowed. Correct. And it was it was really a compulsory mandate in a sense that's different and more extreme, I would I would argue, then it also was against a disease with a 30 percent fatality rate and the vaccine and an excellent record of blocking transmission. Right. The smallpox vaccine, although at the time and I think the you know, the court has already noted this in this argument. Look back then, the way vaccines were and and were developed. Look, it wasn't exactly like they were going through phase one, two and three trials like the EUA and the fully approved vaccine did here. So to to view the smallpox vaccine back then as highly effective with few downsides, I'm not really sure that that tracks the reality of what life was like 120 years ago. But any event, I think at the end of the day, in this case, because the legal theory is so novel, because Jacobson does pretty clearly hold the government can compel vaccination. The directives here are such that, you know, clearly established law did not at the time in August of 2021 clearly established that the governor and the then public health authority director acted improperly or unconstitutionally. And I know this is rare today, but unless this bench has any other questions, I'm happy to answer them. Thank you. Just so that I'm clear, our contention about the standard review is not rational basis. It's no derogation, which is because this is a juice code, no derogation. I don't understand. So a juice codons norm, this court in Sittemann to Blake said that a juice codons norm is something that not cannot be violated ever unless there's another juice codons norm that comes up. And that's the Constitution and its strict scrutiny standards. I think it's a higher standard of the Constitution. It's above strict scrutiny. It's above strict. That's the constitutional standards. You're telling us that there's some body of law out there that floats above the Constitution that we're supposed to use to. No, it's just it's the balancing test between, you know, the sides. You have rational basis and you have strict scrutiny and the balancing test when it comes to an experimental drug. This court has said is no derogation. Now, it's never gotten to the Supreme Court. I still don't understand what no. What does that even mean? You can't you cannot. There's no there's no violation. You can't. There's no review that we just have to. It's an absolute. It's an absolute. Unless you have another juice codons norm that trumps that. And I've cited to the two cases, Second Circuit and Ninth Circuit cases that talk about that. One is Abdullah versus Pfizer. Pfizer being at that time being accused and and actually pled guilty to testing on children in Nigeria. So the standard review here is something different because we're dealing with an experimental. I would think strict scrutiny would be good enough for you. It probably is. But I'm just saying that this court has talked about no derogation as being the standard of that human right. We're talking about a specific human right defined by the Nuremberg Code. Now, as far as the defendant should not have qualified immunity when you're dealing with a juice codons norm like this, especially with what they knew. And we briefed it on page twenty-three of the reply. For example, the appellees knew that COVID-19 was not dangerous. They lied about the vaccines being approved by the FDA. They lied about the vaccines being effective in preventing COVID-19. They knew the vaccines were experimental. They knew they would cause widespread death. Counsel, we've the time the time has expired. Okay. We've got your arguments and we've got your briefs and we appreciate your time. All right. Thank you. The case has now been submitted. We'd like to thank both counsel for your arguments.
judges: HAWKINS, NELSON, COLLINS